UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAPITOL CITY AMUSEMENTS, INC., | No. 2:17-cv-01567-KJM-KJN |
| Plaintiff, | |
| v. | ORDER |
| ZAMPERLA, INC., and DOES 1-50, inclusive, | |
| Defendants. | |

Defendant Zamperla, Inc. moves to compel arbitration and dismiss or stay proceedings. Plaintiff opposes. For the following reasons, the court DENIES defendant's motion to compel arbitration without prejudice.

I. <u>BACKGROUND</u>

Plaintiff Capitol City Amusements, Inc. ("Capitol"), one of California's leading traveling carnival providers, owns and operates amusement rides. Compl., ECF No. 1-1 ¶ 7. In November 2016 while attending a trade show in Las Vegas, Nevada, Capitol City agreed to purchase from defendant Zamperla, Inc. ("Zamperla") an amusement ride, the "Mini Tea Cup," for $75,000, plus $5,588.10 in shipping costs. *Id.* ¶ 8; K. Tate Decl., ECF No. 8-1 ¶¶ 3, 7-8; V. Tate Decl., ECF No. 8-2 ¶¶ 2, 5-6. In the sale negotiations, Capitol's president, Kevin Tate ("Mr. Tate"), and secretary-treasurer, Vera Jane Tate ("Ms. Tate"), expressed concerns about the

1

Mini Tea Cup to Zamperla's salesperson, Michael. Compl. ¶¶ 9-10; K. Tate Decl. ¶¶ 1, 4-5; V. Tate Decl. ¶¶ 1, 3. Specifically, Mr. Tate noted the Mini Tea Cup's reportedly "undersized wheels, axels [*sic*] and tires," which "numerous industry sources" indicated made transporting the ride difficult or impossible. Compl. ¶¶ 9-10; K. Tate Decl. ¶¶ 4-6. Michael responded that the Mini Tea Cup's wheels and axles had been remanufactured to accommodate transportation. Compl. ¶ 10; K. Tate Decl. ¶¶ 6-7; V. Tate Decl. ¶ 4. Mr. Tate and Michael then "negotiated a price for the purchase." K. Tate Decl. ¶ 7. Mr. Tate offered Zamperla $75,000 in cash, which Michael "tentatively agreed to accept" pending "his boss' approval." *Id.* "The only terms and conditions [the parties] discussed, other than the axels [*sic*] and wheels . . . , were the purchase price and the delivery cost." *Id.*

The next day, still in Las Vegas, Michael approached Ms. Tate with "a one page form which looked like a standard purchase order." V. Tate Decl. ¶ 6. Ms. Tate signed the one page document but "was not shown any other contractual terms and conditions before [she] signed." *Id.* "[S]ome weeks later, the Tea Cup was delivered to [Capitol] as agreed." K. Tate Dec. ¶ 8; *see* ECF No. 4-1 at 1 (Agreement with handwritten note, "Buyer to take delivery prior to December 17, 2016"). On an unspecified date, "after [Ms. Tate] had signed [when the one page agreement] was counter-signed and delivered," Capitol was provided with "the purported second page of the 'contract'" containing various terms and conditions. V. Tate Decl. ¶¶ 6, 9; K. Tate Decl. ¶¶ 8, 11.

Capitol alleges Zamperla delivered the Mini Tea Cup with "the 'standard,' undersized tires, wheels and axels [*sic*]" and that Capitol "never would have purchased the Ride had its principals known it would be sold and delivered" this way. Comp. ¶ 10. On May 10, 2017, Capitol sued Zamperla in state court, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, intentional misrepresentation or omission, negligent misrepresentation or omission, unfair business practices and unjust enrichment. *Id.* ¶¶ 1-40. Zamperla removed this case to federal court, Removal Not., ECF No. 1 at 1-2, and filed the instant motion to compel arbitration and dismiss or stay proceedings, Mot., ECF No. 4. Capitol opposes, Opp'n, ECF No. 8, and Zamperla has replied, Reply, ECF No. 9. The court submitted

2

the matter without oral argument on October 30, 2017, Min. Order, ECF No. 12, and resolves the motion here.

II. LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Where there is an enforceable arbitration agreement, the court "shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. This statutory language is mandatory and grants the court no discretion to decline to enforce a valid arbitration agreement. *See Kilgore v. Keybank, N.A.*, 718 F.3d 1052, 1058 (9th Cir. 2013) (en banc) (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)). The court's role under the FAA is limited "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (citation and internal quotation marks omitted).

Although the FAA "embodies the national policy favoring arbitration[,] . . . the liberal federal policy regarding the scope of arbitrable issues is inapposite when the question is whether a particular party is bound by the arbitration agreement." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1291 (9th Cir.), *cert. denied*, 138 S. Ct. 203, 199 L. Ed. 2d 114 (2017) (citations and internal quotation marks omitted). "[A]rbitration is a matter of contract, and a party cannot be required to submit to arbitration in any dispute which he has not agreed to submit." *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1996) (citation and internal quotation marks omitted). Courts apply state law principles governing the formation of contracts to determine whether an arbitration agreement exists. *Norcia*, 845 F.3d at 1283 (citation omitted).

The party seeking to compel arbitration bears the burden of establishing by a preponderance of the evidence that a valid agreement to arbitrate exists. *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citing *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal.4th 394, 413 (1996)). After "the moving party has satisfied its burden, the litigant

3

opposing arbitration must demonstrate grounds which require that the agreement to arbitrate not be enforced." *Harris v. Tap Worldwide, LLC*, 248 Cal. App. 4th 373, 380-81 (2016) (citations omitted). When there is a genuine issue of material fact concerning whether the agreement was ever formed, the court cannot decide as a matter of law that the parties entered into an agreement to arbitrate. *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991) (citation omitted); *see also Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (applying summary judgment standard).

III. DISCUSSION

    A. The Parties' Purported Agreement to Arbitrate

In support of its motion, Zamperla submits a two-page document it contends is the parties' November 9, 2016 agreement, *see* Agreement, ECF No. 4-1 at 1, attached to the end of this order as an exhibit. The Agreement's first page contains Zamperla's name, logo and address at the top and the title, "SALES CONTRACT," immediately below. *Id.* The page then lists the "Buyer," Ms. Tate, her contact information and the date of the transaction. *Id.* The agreement states, "We (Sellers) hereby confirm our acceptance of your (Buyers) purchase order on terms and conditions stated hereunder." *Id.* Immediately beneath this text, a table for spelling out the particulars of the transaction contains handwritten notes indicating certain terms of the agreement. *Id.* (listing, "Quantity," "Description," "Amount," "Set-Up," Delivery," "Subtotal," Deposit" and "Remaining Balance Due," with handwritten entries in each field). *Id.* Immediately below this grid, in a "Terms" section, a handwritten note indicates, "Payment due in full prior to pick up." *Id.* Below that, the "Delivery" section states, "Buyer to take delivery prior to December 17, 2016." *Id.* The bottom of the first page contains a signature line marked for the "Buyer" and "Seller." Both fields are signed. *Id.* There is no text beneath the signature line, other than a handwritten note in the bottom right corner, which states "Page 1." *Id.* This is the entirety of the first page of the contract.

The second page, titled "EXHIBIT A [¶] TERMS AND CONDITIONS," *id.* at 2, recites 18 contract provisions. The arbitration clause at issue here, number 13, provides:

/////

4

> 13. Arbitration
>
> 13.1 Any controversy arising under, out of, in connection with or relating to this Contract or any amendment thereof or the breach thereof shall be determined and settled by arbitration in the county and city of New York in accordance with the Rules of the American Arbitration Association. Any reward therein shall be final and binding on each and all parties thereto and their personal representatives and judgment may be entered thereon in any court having jurisdiction.

Agreement at 2. In addition, Exhibit A includes a choice-of-law provision:

> 15. Applicable Law
>
> 15.1 This agreement shall be construed and enforced under the laws of the State of New York, without regard to its conflict of laws principles.

*Id.* The second page bears no initials or signatures. In the bottom right corner, a handwritten note indicates "Page 2." *Id.*

    B.    Choice of Law

Without urging the court to apply New York law, Zamperla notes, "[t]o the extent the Court finds New York law to be applicable to the subject case and the instant motion, the result does not change." Mot at 4.[1] Capitol argues the choice of law provision is inapplicable here because it and all other terms on the second page "were provided only after the contract was signed." Opp'n at 3. But Capitol cites New York law in footnotes for good measure, *see, e.g.*, *id.* at 4 n.1', a practice Zamperla adopted in its reply, *see, e.g.*, Reply at 2 n.1.

Because this diversity action was removed to federal court, the court applies California's choice-of-law rules to determine whether New York or California law governs the court's contract analysis. *See In re Henson*, 869 F.3d 1052, 1059 (9th Cir. 2017). Under California's choice-of-law analysis, the court will apply New York law only if Zamperla demonstrates, among other things, that New York has a substantial relationship to the parties or their transaction, or that a reasonable basis otherwise exists for the choice of law. *See Washington Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 103 Cal. Rptr. 2d 320, 328 (2001).

---

[1] All citations to the parties' briefing refer to ECF page numbers, not the briefs' internal pagination.

Zamperla makes no attempt to carry its burden here. *See* Mot. at 4 (noting the existence of a choice-of-law provision but foregoing any analysis or argument the court should apply New York law). Furthermore, for reasons discussed below, the choice of law provision is in dispute as Capitol argues the second page of terms, including the choice-of-law provision, was provided only after the parties entered into the contract. *See* Opp'n at 3; *see also Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (explaining that "whether the choice of law provision applies depends on whether the parties agreed to be bound by [the terms] in the first place" but declining to "engage in this circular inquiry" because both states' laws required the same outcome). Because Zamperla relies primarily on California law and provides no reasonable basis for the court to apply New York law under California's choice-of-law principles, the court applies California law. *See Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 787 n.2 (9th Cir. 2001) (applying California law where both parties argued California law controlled and choice of law provision was "in dispute").

C. Whether the Agreement Contained One or Two Pages

Capitol contends it is not bound by the terms on the second page, as that page was added only after Ms. Tate signed the contract. Specifically, Capitol explains Ms. Tate, as its principal, signed a single-page "purchase order" and Zamperla later sent a cross-signed copy of that purchase order, attaching a second page that contained new terms and conditions not provided at the time of contracting. *See generally* Opp'n. According to Capitol, which supports its argument with Mr. Tate and Ms. Tate's sworn declarations, the parties' negotiations were limited to the Mini Tea Cup's specifications, the price and delivery costs. Opp'n at 3; K. Tate Decl. ¶¶ 4-7. When Ms. Tate signed the one-page document, she was unaware of any terms and conditions beyond that single page. *See id.*; *see also* V. Tate Decl. ¶ 6. Capitol thus contends it is not bound by terms and conditions Zamperla belatedly proposed and to which Capitol did not agree. Opp'n at 2, 3, 7.

Zamperla contends the second page was printed on the back of the first page when Ms. Tate signed it, and that it should not be faulted for Ms. Tate's failure to turn the page over and read it before signing. Zamperla makes this argument for the first time in reply, without

6

evidentiary support, stating the parties' purported Agreement was printed on a single page with "specifics of the transaction on its face page, and [] the general terms and conditions applicable to the transaction on the reverse side." Reply at 5; *see generally* Mot. and Agreement (submitting the agreement without a declaration and providing no indication the agreement printed on two sides of a single page). This is a "standard Sales Contract utilized by Zamperla in many of its amusement ride sales." *See* Reply at 5. Accordingly, Zamperla's view is that regardless of whether Capitol "saw" the terms and conditions, it was "provided" with those terms and conditions on the reverse side of the single page Ms. Tate signed. *Id.* Zamperla speculates that "Ms. Tate simply didn't look at the reverse side or, if she did, she either simply didn't read it or she knew that the arbitration provisions are hardly rare and paid no attention to it." *Id.* Zamperla further argues Capitol cannot claim surprise because "when the Tates first 'saw' the provision [upon delivery on an unspecified date] they apparently made no objection to it." *See id.* at 6. Notably, Zamperla provides no verified factual account of the parties' contracting, leaving the Tates' sworn declarations unrebutted.

D. <u>Existence of a Valid Agreement to Arbitrate</u>

Although Capitol opposes Zamperla's motion on grounds of procedural and substantive unconscionability and does not concretely address formation, Capitol consistently suggests the parties did not enter into a valid agreement to arbitrate. *See, e.g., id.* at 2 ("Plaintiff was unaware of [the arbitration provision] at the time the contract was signed and denies agreeing to be bound thereby."); *id.* at 3 ("Plaintiff's argument herein is based on the premise that the written terms set forth on the second page of the contract were provided only after the contract was signed and thus those terms (including the arbitration provision) are unconscionable and unenforceable."); *id.* at 7 ("[G]iven that there are multiple defects with the contract, including that plaintiff never had a chance to review the arbitration provision prior to signing the contract, the Court should invalidate the entire agreement due to unconscionability."). Capitol's arguments are "internally inconsistent." *See Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (2001), *as modified* (June 8, 2001). Capitol suggests there was no mutual assent to an arbitration provision but cloaks this argument in the language of

7

unconscionability, which "presupposes" the provision is part of the parties' contract. *See id.* (explaining trial court could not properly determine a contract term lacked mutual assent and was unconscionable because "[t]he doctrine of unconscionability is a defense to the enforcement of a contract or a term thereof") (citations omitted). Nonetheless, Zemperla bears the burden of establishing a valid arbitration agreement exists. *See Knutson*, 771 F.3d at 565. Capitol's arguments, though imprecise, call the validity of that agreement into question. The court therefore considers this threshold issue.

Based on this record, the court finds there is a live factual dispute as to whether Capitol signed a version of the Agreement containing only page one (without the arbitration provision) or both pages (with the arbitration provision). Capitol claims, with supporting declarations, it signed a one page contract. Zamperla claims the contract consisted of two pages. Even if the second page was printed on the reverse of the first page, an assertion Zamperla omitted until its reply, Zamperla has not met its burden in showing Capitol assented to the second page's terms. *See Meyer v. Benko*, 55 Cal. App. 3d 937, 942-43 (Ct. App. 1976) ("The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe.") (citation omitted).

1. Duty to Read

Zamperla invokes the duty to read, arguing Capitol was charged with a duty to review the reverse side of the contract and is entitled to no relief for its failure to do so. Reply at 6. "[O]rdinarily one who signs an instrument which on its face is a contract is deemed to assent to all its terms." *Marin Storage & Trucking, Inc.*, 89 Cal. App. 4th at 1049; *Stewart v. Preston Pipeline Inc.*, 134 Cal. App. 4th 1565, 1587 (2005) (finding mutual assent "established from the face of the agreement" containing plaintiff and his attorney's signatures with "no indication . . . [assent] was conditional or that plaintiff did not intend to be bound by its terms"). The duty to read is virtually unassailable. *See Roldan v. Callahan & Blaine*, 219 Cal. App. 4th 87, 93 (2013) ("[T]he law effectively presumes that everyone who signs a contract has read it thoroughly, whether or not that is true."). There is a difference, however, between objective manifestation of

8

assent to a clause the party declined to actually read, *see Stewart*, 134 Cal. 4th at 1587, and the inability to manifest such assent when a party does not know, and has no reason to know, the clause exists.

"[A]'n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious.'" *Knutson*, 771 F.3d at 566' (quoting *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 992 (Ct. App. 1972) (internal quotation marks omitted). In *Windsor Mills*, the seller's "Acknowledgment of Order" forms, provided to but not signed by the buyer, indicated the date of the order, order number, shipping instructions, description, quantity and price. 25 Cal. App. 3d at 990-91. The buyer's president stated that although the forms were received by his company, the forms "were not brought to his attention nor did he see them at all until after arbitration proceedings had been initiated." *Id.* at 991. Because the forms were not obviously contractual in nature, the buyer was not bound by the arbitration term printed on the reverse side of each form, although fine print on the bottom of the face pages indicated each order was "subject to all terms and conditions on the face and reverse sides hereof . . . ." *Id.*

Here, the first page of the agreement is expressly titled "SALES CONTRACT" and requires the signature of both parties. Agreement at 1. Capitol does not argue the parties never entered into a contract for the Mini Tea Cup, but instead argues Capitol assented only to the terms on the face page and not the later provided "purported second page" of terms and conditions. *See* V. Tate Decl. ¶ 6. Thus, Capitol City is not entitled to the exception for a "writing [that] does not appear to be a contract." *See Marin Storage & Trucking, Inc.*, 89 Cal. App. 4th at 1050. The inquiry, then, is whether Capitol's manifestation of assent to the Agreement on page one would lead a reasonable person to believe Capitol assented to the terms contained on page two. *See Meyer*, 55 Cal. App. 3d at 942-43.

Based on the record before it, the court cannot conclude a reasonable party would suspect additional terms were printed on the purported second page of the agreement and therefore cannot conclude Capitol assented to the arbitration provision. Because the face page

9

here does not clearly incorporate the terms printed on the reverse or otherwise indicate additional terms were provided there, the contract cannot reasonably be deemed a one-page, double-sided contract for which the signing party is charged with the duty to read the reverse. *Cf. Marin Storage & Trucking, Inc.*, 89 Cal. App. 4th at 1047 (noting "[t]he clause immediately above the customer's signature states, 'This is a contract which includes all terms and conditions stated on the reverse side'" and deciding, "[t]here is simply no basis for a conclusion that the document was unrecognizable as a binding contract."); *Rodriguez v. Am. Techs., Inc.*, 136 Cal. App. 4th 1110, 1123–24 (2006) (finding plaintiff assented to an arbitration clause where the contract "[c]learly stated on the front page, above the signature lines, . . . : 'REVERSE SIDE TERMS: The Terms and conditions on the reverse side of this Proposal are incorporated herein by reference.'"); *Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 721-22 (N.D. Cal. 2012), *aff'd*, 549 F. App'x 692 (9th Cir. 2013) (holding duty to read doctrine foreclosed challenge to formation where arbitration provision printed on the reverse side of a single page contract was incorporated by reference on the face page plaintiff signed).

Here, the face page not only omits an incorporation provision, but also omits any reference to the signatories' assent to 18 contractual terms inconspicuously printed on the reverse side, if they were on the reverse side. The face page merely provides, "We (Sellers) hereby confirm our acceptance of your (Buyers) purchase order on terms and conditions stated hereunder." Agreement at 1. The terms and conditions "[t]hereunder" are concretely identified in handwritten notes indicating the "Quantity," "Description," and "Amount," of Capitol's purchase and the details for delivery. *Id.* With the parties' terms apparently exhaustively listed on the face page and without any reference to a second page printed on the reverse, the court cannot conclude a reasonable party would expect to see anything other than a blank page on the reverse. Accordingly, the court cannot conclude Capitol had a duty to inspect the reverse page for hidden terms and manifested its assent thereto by signing the face page. *See Meyer*, 55 Cal. App. 3d at 942-43 (1976).

This finding does not conflict with the California Supreme Court's holding that the drafter of a contract is "under no obligation to highlight the arbitration clause of its contract," or

"to specifically call that clause to [the signer's] attention." *See Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 914 (2015) (rejecting consumer's argument he did not know his single page double sided car contract densely packed with text on both sides contained an arbitration provision on the reverse). As *Sanchez* recognized, the FAA preempts state statutes "singling out arbitration provisions for suspect status, requiring instead that such provisions be placed upon the same footing as other contracts." *See Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (citation and internal quotation marks omitted); *see also Sanchez*, 61 Cal. 4th at 914 (citing *Casarotto* and noting the FAA would preempt any state law requiring a drafter to highlight an arbitration provision). Accordingly, although Zamperla was not obligated to specifically highlight the arbitration clause, it was not entitled to hide it and all other clauses on the reverse of a one-page agreement where nothing in the record suggests the signatory would reasonably be expected to look.

Here, Capitol does not impermissibly seek to avoid a term "buried" in a lengthy contract. *See Acceler-Ray, Inc. v. IPG Photonics Corp.*, No. 5:16-CV-02352-HRL, 2017 WL 1196835, at *6 (N.D. Cal. Mar. 31, 2017), *appeal dismissed*, No. 17-15939, 2017 WL 5202039 (9th Cir. Sept. 8, 2017). There is no evidence that double-sided single page contracts are an industry standard and Capitol reasonably should have known additional conditions were printed on the reverse side. *See Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 812 (1981) (contracts with arbitration provisions "were all prepared on an identical form known in the industry"). Likewise no evidence of prior dealings show Capitol was on notice of an arbitration term. *See Marin Storage & Trucking, Inc.*, 89 Cal. App. 4th at 1051 (parties' "course of dealing, conducted over many years and numerous hirings," established mutual assent to seller's form terms and conditions regardless of whether buyer was subjectively aware of terms). Simply put, Zamperla has not met its burden to show Capitol manifested assent to the arbitration provision.

2. Failure to Object and Later Assent

Zamperla argues, "when the Tates first 'saw' the provision they apparently made no objection to it," suggesting Capitol may have assented to the terms after signing. *See* Reply at 6 (discussing whether arbitration provision is unconscionable). While this could be construed as

an argument Capitol assented to the later provided terms, *see, e.g.*, *Textile Unlimited, Inc.*, 240 F.3d at 787-78 (addressing assent to acceptances containing addition or different terms under the California Commercial Code); *Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal. App. 4th 1372, 1386 (1993), *as modified on denial of reh'g* (Jan. 7, 1994) (discussing acceptance from inaction in the face of a duty to act or through retention of the benefit offered), the record does not support such a finding.

Based on the parties' briefing and supporting documents, it is impossible to determine when Capitol first received the Agreement's second page. Zamperla is silent on the subject. Capitol explains only that it received the second page "[s]ubsequent to the execution of the written agreement by the parties," Opp'n at 1, and "after [Ms. Tate] had signed when [the Agreement] was counter-signed and delivered to [Capitol]," V. Tate ¶ 6. Nothing clarifies whether the parties both signed the agreement on November 29, 2016, or whether Zamperla signed later. Further, it is not clear whether Capitol received the second page before or after the Mini Tea Cup was delivered.

Accordingly, the court cannot conclude Capitol agreed to the arbitration provision when it was provided with the page two of the Agreement after signing.

IV. CONCLUSION

Zemperla seeks to compel arbitration and thus bears the burden of establishing by a preponderance of the evidence that a valid agreement to arbitrate exists. Zemperla has not met its burden.

Accordingly, Zamperla's motion to compel arbitration is DENIED without prejudice.

IT IS SO ORDERED.

DATED: March 6, 2018.

_____
UNITED STATES DISTRICT JUDGE

**SALES CONTRACT** — Zamperla, Inc., 49 Fanny Road, Boonton, NJ 07005 USA. Phone: (973) 334-8133. Fax: (973) 334-6880. Email: Zamperla@zamperlausa.com. www.zamperla.com

Buyer Name: JANE TATE
28 Hepner Drive, PO 21153
Carson City, NV 89721
Attn: Kevin Tate

Date: 11-29-2016
Cell: 916-304-2003
Email: Kevin@californiacarnival.com

We (Sellers) hereby confirm our acceptance of your (Buyers) purchase order on terms and conditions stated hereunder.

| Quantity | Description | Amount |
|---|---|---|
| 1 | Mini Tea Cup T/M 630GMT06R 14230 US | $75,000.00 |
| 12 | Fence | |
| 2 | Gates | |
| | 100' lead cord | |

Set-Up: Not included

Delivery: F.O.B 49 Fanny Road, Boonton, NJ 07005

Subtotal: $75,000.00
Deposit: $10,000.00 (cash recvd)
Remaining Balance Due: $65,000.00

Terms: Payment due in full prior to pick-up
Delivery: Buyer to take delivery prior to December 17, 2016

Seller [signature]   Buyer [signature] Kevin Jane Tate

Page 1

Agreement at 1.

# EXHIBIT A
# TERMS AND CONDITIONS

**1. Terms Paramount**
1.1 In the event any of the terms of this Contract are different from or additional to those proposed by the Buyer in his purchase order, or those contained in any letter of credit or other document incidental to this Contract, the terms of this Contract shall prevail.

**2. Complete Agreement**
2.1 This writing is intended by the parties as a final expression of their agreement and is intended also as a complete and exclusive statement of the terms of their agreement. No course of prior dealings between the parties and no usage of the trade shall be relevant to supplement or explain any term used in this agreement. Acceptance or acquiescence in a course of performance rendered under this agreement shall not be relevant to determine the meaning of this agreement, even though the accepting or acquiescing party has knowledge of the nature of the performance and opportunity for objection.

**3. Amendments**
3.1 No amendment or modification of this Contract shall be valid unless it is in writing and signed by the party to be charged.
3.2 No agent shall have authority to incur, on Seller's behalf, any obligations or liabilities other than those contained in this Agreement.

**4. Delivery**
4.1 This is a shipment Contract and the goods shall be delivered F.O.B. Boonton, New Jersey warehouse.
4.2 Seller shall have the right to ship the goods sold hereunder in one or more shipments or deliveries as Seller deems advisable.
Each shipment or delivery hereunder shall be construed and considered as a separate sale under the terms and conditions of the contract, and Buyer agrees to accept and pay for each such shipment or delivery as provided herein. Should Buyer fail to accept and pay for each such shipment or delivery, Seller may, without prejudice to any other lawful remedy, defer further shipments or deliveries until acceptance thereof by Buyer or payment is made by Buyer, or at its option, Seller may without liability whatsoever regard such failure to accept or pay for such shipment as a breach of the whole Contract and terminate this Contract as to any unaccepted, or undeliverable portion thereof, as well as any other outstanding contract with Buyer, and Buyer shall be responsible for any expense and/or loss sustained by Seller by so doing.

**5. Title**
5.1 Title to the goods shall remain with the Seller until Seller actually receives payment in full for the goods, unless otherwise expressly provided in the terms appearing on the face of this Contract.

5.2 Seller shall retain a security interest on the goods sold on credit to Buyer, including all rides sold to Buyer, all parts, attachments and additions thereto now or hereafter acquired and all replacements and substitutions therefor and all proceeds from the sale of such rides, including accounts receivable, until paid in full by Buyer (the "Ride"). Seller may file any financing statements of their equivalent in any jurisdiction at any time it deems necessary to maintain its interest, with or without the signature of Buyer; Buyer agrees to execute any financing statements and any amendments thereto required by Seller and hereby specifically authorizes Seller to file such statements with its signature. Installment payments made by Buyer shall be applied to the Ride as follows: in the case of merchandise purchased on different dates, the item purchased first shall be deemed paid for first and in the case of merchandise purchased on the same date, the lowest priced items shall be deemed paid for first.

**6. Risk of Loss**
6.1 Risk of loss, or damage to, or destruction of the goods shall be with the Buyer from and after delivery to carrier or Buyer at the point of sale stipulated on the face hereof.

**7. Limited Warranty**
7.1 Seller warrants to Buyer each part of this amusement ride to be free under normal use and service from defects in workmanship and construction for a period of six (6) months from the date of delivery to the original retail purchaser.
This warranty is limited to materials of Seller's manufacturer or importation, which have been used properly and given the necessary maintenance.
This warranty is further limited to repairs to be made at Seller's facility in Parsippany, New Jersey.
Should Buyer wish to have repairs done at a place of its choosing, Buyer shall pay all costs and expenses, including but not limited to, traveling, sojourn expenses and salary for Seller to send one of it's employees to the place chosen by Buyer for such repairs. However, Buyer shall not be liable for the salary of Seller's employee during such times as said employee is actually engaged in repair work on the defective amusement ride.

THIS WARRANTY IS EXPRESSLY IN LIEU OF ANY OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING ANY IMPLIED WARRANTY OR MERCHANTABILITY OR FITNESS, AND OF ANY OTHER OBLIGATION ON THE PART OF THE SELLER.

**8. Claims**
8.1 All Claims of the Buyer for defects, nonconformity, loss, damages, errors, or shortage in goods delivered by Seller to Buyer under this Contract shall be made by Buyer in writing and delivered to the Seller within thirty (30) days after receipt of goods and before the goods or any part of them are put into operation or use, or in any way changed from the original condition. Such written notice of claim shall fully specify all claimed defects, non-conformity, loss damages, errors or shortages in goods. All claims for loss, damages, errors, or shortage in goods must also be recorded on dock delivery receipt prior to removal of material from the pier or on inland Bill of Lading and/or trucker's receipt of goods delivered to Buyer by Seller and a copy of such delivery record shall be submitted to Seller, together with the above-mentioned written notice of claim. Upon receipt of written notice of claim, Seller shall have the right to inspect the materials.

**9. Notice of Claims**
9.1 The receipt by Seller of a written notice of claim within the time above specified shall be a condition precedent to Buyer's right to reject, cancel, replace or claim damages, or to bring any suit, proceeding or demand arbitration. Such failure by the Buyer to give timely written notice shall constitute an irrevocable acceptance of the goods and an admission that they fully comply with all the terms, conditions and specification of this contract.

**10. Limitation of Damages**
10.1 Seller shall not be liable for prospective profits or special, incidental or consequential damages. Buyer's sole and exclusive remedy, at Seller's sole option, shall be either the replacement of non-conforming goods or refund of the purchase price. No goods shall be returned to the Seller without Seller's written consent.

**11. Waivers**
11.1 The failure of either party at anytime to require performance by the other party of any provision hereof shall in no way affect the full right to require such performance at any time thereafter, nor shall the waiver by either party of a breach of any provision hereof constitute a waiver of any succeeding breach of the same or any other such provision, nor constitute a waiver of the provision itself.

**12. Severability of Clauses**
12.1 In the event of any term, condition, covenant or portion of this Contract is held to be unconscionable or otherwise invalid, the remainder of this agreement will remain in full force and effect, and the Seller and Buyer hereby stipulate that such term, condition, covenant or portion of this Contract shall be limited and modified so as to avoid an unconscionable result, and as limited and modified shall become a part of this Contract. All titles used herein are for purposes of reference only.

**13. Arbitration**
13.1 Any controversy arising under, out of, in connection with or relating to this Contract or any amendment thereof or the breach thereof shall be determined and settled by arbitration in the county and city of New York in accordance with the Rules of the American Arbitration Association. Any award rendered therein shall be final and binding on each and all parties thereto and their personal representatives and judgment may be entered thereon in any court having jurisdiction.

**14. Limitation of Actions**
14.1 Any action, arbitration or proceeding for breach of this agreement must be commenced within one (1) year after the cause of action accrues.

**15. Applicable Law**
15.1 This agreement shall be construed and enforced under the laws of the State of New York, without regard to its conflict of laws principles.

**16. Force Majeure**
16.1 The Seller shall not be liable for any delay in shipment or delivery, non-delivery, or destruction or deterioration of all or any part of the merchandise, or for any other default in performance of this Contract arising from acts of God, perils of the sea, acts of or restrictions imposed by any governmental authority, fire, war, insurrection, riot or civil commotion, strikes or lockouts, partial or total interruption or loss or shortage of transportation or loading facilities, failure of or delay in shipment on the part of any supplier or suppliers, floods, drought, breakdown of machinery, accidents causing stoppage or work or from any other cause beyond control of the Seller, whether or not similar to the causes hereinbefore specified. The Seller may, upon removal of cause, resume making shipments or deliveries and the Buyer is bound to accept such delayed shipment or delivery. However, if the delay shall be more than sixty (60) days, balance of Contract may be canceled by either the Buyer or the Seller who shall, when requested by the other party, state in writing whether he elects to cancel. If Seller is able to perform part of his obligations in spite of the event giving rise to his excuse, he need not make an allocation in accordance with Section 2-615(g) of the Uniform Commercial Code.

**17. Modification of Credit**
17.1 Seller reserves the right at any time to alter, or suspend credit, or to change the credit terms provided herein, when in his sole opinion the financial condition of the Buyer so warrants.
In such a case, in addition to any other remedies herein or by law provided, cash payment or satisfactory security from the Buyer may be required by the Seller before shipment, or, if the due date of payment by the Buyer under this Contract may be accelerated by the Seller. Failure to pay invoices at maturity date automatically makes all subsequent invoices immediately due and payable irrespective of terms, and Seller may withhold all subsequent deliveries until the full account is settled. Acceptance by the Seller of less than full payment shall not be a waiver of any of his rights. Security deposited or made available to the Seller by the Buyer shall be taken as security for payments due under any other contract between the Buyer and Seller.

**18. Entire Agreement**
18.1 This Agreement supersedes all prior understanding and agreements, whether oral or written, between the parties, and may not be changed orally and no change, amendment or modification thereof shall be binding unless set forth in writing and signed by the parties hereto.
IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Page 2

Agreement at 2.

14